### ROWLAND v. BIESECKER.

(Circuit Court, S. D. New York. June 21, 1910.)

1. Courts (§ 376*)—Competency in Federal Courts—Conformity Statute.

Rev. St. § 858, as amended by Act June 29, 1906, c. 3608, 34 Stat. 618 (U. S. Comp. St. Supp. 1909, p. 242), which provides that "the competency of a witness to testify in any civil action, suit or proceeding in the courts of the United States shall be determined by the laws of the state or territory in which the court is held," applies as well to suits in equity as to actions at law.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 376.*]

2. Patents (§ 209*)—Licenses—Consideration.

A license under a patent in which the licensee promises to pay a royalty, to use diligence to push the use and sale of the patented article, and not to sell competing machines not legally patented nor to competitors in business of the patentee, is not without sufficient consideration.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 300–303; Dec. Dig. § 209.*]

3. Evidence (§ 445*)—Variation of Writing by Parol—Scope of Rule.

The rule that a written contract may not be varied collaterally applies only to the negotiations which finally take form in the written contract itself, and does not affect a subsequent transaction between the parties although oral.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2052–2065; Dec. Dig. § 445.*]

4. Frauds, Statute of (§ 141*)—Operation—Contract as Defense.

Conceding that a contract relating to a patent license is subject to the statute of frauds, it is only the continuing obligations which are affected, and not the effect of the license while unrevoked as a defense against a charge of infringement.

[Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. § 343; Dec. Dig. § 141.*]

5. Patents (§ 211*)—Licenses—Construction and Operation.

A license under a patent for a term of 5 years "with a privilege of 10 years" gives the licensee the right to continue the license in force for the extended term, and if any notice of his election to do so is necessary, beyond his continuing to make the patented machines, it may be given orally.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 304–311; Dec. Dig. § 211.*]

6. Patents (§ 312*)—Suit for Infringement—Evidence Considered.

Evidence considered in a suit for infringement of a patent brought by an assignee after the death of the patentee against a former licensee, and

---

*held* to establish the claim of defendant that the license had been extended in accordance with its terms.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 312.*]

In Equity. Suit by James Rowland against John S. Biesecker. Decree for defendant.

This is an ordinary bill in equity upon a patent for a butter cutter, assigned by the patentee, Reuben S. Stone, to the complainant on November 13, 1906. The defendant, who is a dealer in dairy machines, acknowledges the infringement, and pleads in justification a written license from Stone dated July 31, 1899, for a period of five years "with a privilege of ten years." The grant of the license is in the following words: "Said party of the first part (Stone) agrees to give party of the second part (the defendant) the exclusive trade and control in the United States of the aforementioned Stone Butter Cutter." Stone was to furnish all machines that the defendant wanted at $70 each, and if the defendant could get them made for less than that Stone would take $25 royalty on each. The first five years of this agreement expired on July 31, 1904, and most of the testimony concerns the question whether Stone, who is now dead, had ever extended the time to July 31, 1909, which was 10 years from the date of the agreement. The suit was commenced by service of a subpœna in February, 1909, and the defendant has sold no patented machines after July 31, 1909, nor does he claim any right to do so after that date. The patent was granted on May 2, 1899. The complainant asserts that no testimony of the defendant is competent to any transactions between him and Stone, though he concedes that such a license would be binding upon him regardless of his own notice. Further, he insists that the testimony in any case is void as showing an oral contract to vary a written license, and that the agreement was also bad under the statute of frauds. Finally, he disputes the existence of the extension in fact, and asserts that it was in any event without consideration. The testimony will be considered below in the opinion.

McDonald & McDonald, for complainant.

Geo. C. De Lacy, for defendant.

HAND, District Judge (after stating the facts as above). I agree that since the change in section 858 of the Revised Statutes no testimony of conversations or other transactions between Stone and the defendant is competent evidence, and I shall disregard it altogether in the conclusions I shall make. Section 829 of the New York Code makes all such testimony incompetent and section 858 applies as well to suits in equity as to actions at law.

So far as concerns the claim that the license was without consideration, I need not consider whether a license without consideration is good until revoked, because there was good consideration in any event in the defendant's own promises. In the license he promises "to use the diligence, push, and perseverance he uses in his business in general to advance the sale of the aforementioned butter cutter"; also "not to handle or sell any butter cutter machine competing with the above machine that is not legally patented," and in addition "not to sell any of the above machines to dealers competing in the butter trade" with Stone. Of course an unpatented butter cutter was not necessarily a legal infringement of the patent in suit, and the defendant's undertaking was therefore by no means the same thing as to promise not to do that which he was already bound not to do. Moreover, the agreement

not to sell to competing dealers was alone consideration enough. Of course no subsequent transaction between Stone and the defendant, though oral, could be obnoxious to the rule that a written contract may not be varied collaterally, because that rule only applies to the negotiations which finally take form in the written contract itself.

The point that the extension was not a real extension at all, but a new agreement for five years, and so within the statute of frauds, depends, even if sound in law, upon the defendant's story that he had found the price of the machines so low that at it they could not be made strong enough. He says that Stone agreed with him that $70 was not enough to make the machines solidly and that he should make them himself and allow Stone no royalty, but pay him a fair amount for any information brought by Stone which led to the sale of a machine. Even assuming that such a contract was within the statute of frauds, the complainant has objected to the only evidence which establishes the variation in its terms upon the ground that it is incompetent. With that testimony out of the case there is no evidence of anything but a mere extension of the license for the remainder of the period, to which the complainant himself concedes no writing was necessary. By excluding that testimony he necessarily excluded all consideration of the change upon which he relies to say that it was a new contract. Of course, that may leave the defendant liable to Stone's estate or to the defendant for certain royalties reserved under the license, but that is quite another matter and the subject of a different proceeding, and it cannot be made the basis of this suit which presupposes that the defendant has illegally sold the machines in question.

But there is another and more substantial reason why this defense is not good. Even assuming that a contract relating to a patent license is subject to the statute of frauds (Buhl v. Stephens [C. C.] 84 Fed. 922), it is only the continuing obligations which are affected. A license is, however, only the waiver of the illegality of the infringement, and it is not an obligation at all. It is not necessary here to determine whether the complainant here could have revoked the license, for he did not do so prior to suit brought. All the defendant's acts up to that time were legal under the license, and the bill when filed was without justification. And although in equity the decree speaks as of the time when entered, now the defendant has discontinued infringement. I know that such discontinuance is not a good excuse when a valid ground of equity existed at the time the bill was filed, but here the bill had no basis in fact for an injunction, because the complainant had not asked the defendant to stop or revoke the license. He sprang upon him from the dark at a time when all his acts were privileged and licensed. If he would take advantage of his subsequent reliance upon the license, which was revoked by bringing this suit, he must file a new bill. No injustice is done by this, as the question is now solely of royalties, and those can be collected at law. In what I have said I have only assumed without deciding that the license for the remaining five years was void. It may well be that the only void part of the contract was Stone's agreement to forbear his royalties.

Hitherto I have spoken of the written agreement of July 31, 1909, as a license because the defendant so regards it, and the complainant does

not in his brief seem to question that it was not an assignment. However, it is quite clear that it was not an assignment, because the patentee clearly had the right to make and use as many of the machines as he chose and the defendant had no right to make them, unless he could do so below a certain price, and, so far as appears, he had no right to use them at all. His rights of "exclusive trade and control" were not the full rights necessary to an assignment. Waterman v. Mackenzie, 138 U. S. 252, 255, 11 Sup. Ct. 334, 34 L. Ed. 923.

The issues, therefore, are narrowed down to this: Whether, disregarding the testimony of Biesecker to any transaction between himself and Stone, the defendant has by the preponderance of evidence established that he had a license to make these machines between July 31, 1904, and July 31, 1909, for, if he had, both sides concede that the complainant was bound by it. To determine this the meaning must first be ascertained of the words "with a privilege of ten years." It is clear that the privilege intended was that of the defendant; he was the licensee, and, though he did make certain engagements in regard to the conduct of the trade while the patent endured, still it would be a very strained construction of the whole contract to say that Stone had the privilege to hold him to those engagements for the added five years. However, it is not even necessary to decide that, because, even if both had the privilege, either could exercise it ex parte. Nor were there any formalities prescribed as to the mode of its exercise. Had the defendant orally told Stone that he meant to go on, that was enough, whether Stone assented or not. Indeed, it is not clear that more was necessary than that the defendant, without notice, should go on making the machines, or in any other way indicating his intention to use the remaining period of the license.

But it is not necessary to decide this, because there are two witnesses clearly competent who testify to interviews with Stone, which if true clearly show that the license was extended. One of these, Benson, swears that in May or June, 1904, Stone was in the office and the defendant said to his brother, Edgar, "This settles the sale of Dr. Stone's butter cutter for the next five years;" to which Stone answered, "That is right." It is true that the brother was not called, and that was probably because he did not remember the conversation, and it is also true that Benson then was, and now is, the defendant's bookkeeper. Nevertheless, I cannot and should not for those reasons simply disregard his testimony. The other witness, Charles N. Biesecker, another brother of the defendant, testifies that late in 1904 or early in 1905 he complained about the machines to Stone, who said that he would not be bothered with them any more, that he would turn them all over to the witness and that the license had been renewed. Further, the defendant says that after July 31, 1904, Stone saw one of the newly constructed machines in the store and handled it. All these witnesses say that Stone was constantly in the defendant's office, and the obvious purpose of his visits was in regard to this butter cutter. It is of course possible that he did not know that the defendant kept on making them after July 31, 1904, but it is unlikely in view of the frank advertisement of the machine in the 1904 catalogue. No one suggests that

he at any time objected to their manufacture. Of course, all testimony of what a dead man has said and done must be taken charily. I feel the disadvantage of the complainant here, but still it is too much, when there is no inherent probability, but quite the contrary, to ask me to hold that each one of three apparently honest men is deliberately perjuring himself about a matter of obviously very trivial interest to them. Disregarding all the defendant's testimony as to any personal transactions I am satisfied that Stone knew before July 31, 1904, or thereabouts, that the defendant meant to go on with the manufacture of the cutters, and that is enough, I think, to be an exercise of his privilege, even assuming that anything more was necessary than for the defendant to go on as he had been doing.

Bill dismissed, with costs.